UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                                    Chapter 11

1234 PACIFIC MANAGEMENT LLC,                               Case No. 1-19-40026 (NHL)

                                          Debtor.
-------------------------------------------------------------x

### DEBTOR'S OBJECTION TO THE
### ALLOWANCE OF DEFAULT INTEREST

**TO THE HONORABLE NANCY HERSHEY LORD,**
**UNITED STATES BANKRUPTCY JUDGE:**

      1234 Pacific Management LLC (the "Debtor") as and for its Objection to that portion of the proof of claim filed by 1234 Pacific Street Lender LLC (the "Note Buyer"), a copy of which (without exhibits) is annexed hereto as <u>Exhibit</u> "A" (the "Claim"), seeking default interest in the pre-petition amount of $4,469,333.33, represents and shows this Court as follows:

### I. OVERVIEW

      1.    Only on Fantasy Island can the Note Buyer hope to recover default interest of almost $4.7 million (and allegedly mounting) on a principal debt of approximately $3.2 million even though the underlying mortgage was <u>never</u> once subject to a missed payment or previously declared in default. In fact, the notion that the Note Buyer can somehow obtain astronomical levels of default interest (post-petition) without a declaration of default borders on the absurd. Accordingly, this Court should not only expunge all default interest charges, but admonish the Note Buyer for filing a misleading and highly inflated claim.

      2.    Unfortunately, the rapacious demand for default interest (based upon a 24% default rate as compared to a non-default rate of 3.5%) has skewed the Debtor's finances and unnecessarily complicated the Debtor's efforts to reorganize. Resolution of this objection is

1

absolutely critical to the Debtor's ability to promulgate its own competing plan of reorganization[1].

3.    It is noteworthy that the Note Buyer is an affiliate of a vulture fund known as Maverick Real Estate Partners ("Maverick"),[2] and first acquired the note and mortgage from the original lender, Signature Bank, only <u>after</u> the bankruptcy case was filed. This was done with the goal of using the Debtor's need for Chapter 11 to extort exorbitant default interest.

4.    Unlike most real estate cases, this Chapter 11 was filed for reasons unrelated to any type of mortgage foreclosure. Indeed, the Debtor made mortgage payments to Signature Bank like clockwork through automatic payment deductions. Rather, the bankruptcy was triggered by a default judgment obtained by a Building tenant (Gloria Malcom) who purportedly fell at the property. While the Debtor attempts to address this personal injury claim through negotiation and a refinancing of the Building, this Objection is intended to bring a sense of reality and proportion to the mortgage indebtedness.

## II. BACKGROUND FACTS

5.    The Debtor is the owner of a residential apartment building located in the Crown Heights section of Brooklyn at 1232-1234 Pacific Street (Block 1206, Lot 28), containing 36 one and two bedroom apartments (the "Building"). The Building is fully occupied and generates a current monthly rent roll of approximately $50,000.

---

[1]    The Lender filed a creditor's plan on July 8, 2019 to sell the Building out from under the Debtor, based on the false presumption that its alleged default interest of $4,469,333.33 properly forms a part of its secured claim, now alleged to be in excess of $7.0 million.

[2]    Maverick is not a stranger to claims of predatory lending. It was recently sued for charging default rate interest at 24%, even though its foreclosure case was dismissed. *See,* https://therealdeal.com/2019/08/15/chelsea-landlord-claims-predatory-lender-is-charging-a-crippling-interest-rate-as-punishment-after-losing-foreclosure-case.

6.    In 2014, the Debtor refinanced the then-existing mortgage and borrowed the sum of $4 million from Signature Bank pursuant to that certain Restated Note dated June 2, 2014 (the "Note"), bearing interest at a rate of 3.5% with a 30-year amortization, subject to a balloon payment on the initial maturity date of June 10, 2019.[3]

7.    The loan was secured by a First Mortgage Consolidation, Extension, Modification and Security Agreement of even date (the "Mortgage") granting a first mortgage lien encumbering the Building.  The loan was guaranteed by Mendy Lowy, Managing Member of the Debtor.

8.    After the mortgage loan was made, the Debtor timely made all monthly installments of principal and interest as required, through automatic deductions from the Debtor's bank account at Signature.  As of the Chapter 11 filing on January 3, 2019, the Debtor had paid down the principal balance to approximately $3.2 million.

9.    All deductions for monthly principal and interest payments of $17,961.79 are duly referenced in the Debtor's Signature Bank statements covering the period from 2014 to 2018, collectively annexed hereto as Exhibit "B".

10.    Additionally, the Debtor was current with respect to payment of all real estate taxes and insurance, and ran the Building without any issues, problems or controversy with Signature Bank.

11.    Although the Debtor's relationship with Signature Bank was fine, the Debtor nevertheless encountered financial difficulties as a result of a default judgment obtained by a tenant at the Building, Gloria Malcolm, who commenced a "slip and fall" case after she was allegedly injured on December 4, 2014.

---

[3] The Note was subject to a five (5) year extension.

12.    The lawsuit was started in February 2015, with service of process made through the Secretary of State. The Debtor did not respond to the complaint, by reason of alleged lack of service, and a default judgment was entered on March 17, 2016. Ms. Malcolm was ultimately awarded $830,015 in damages at inquest.

13.    The Debtor's efforts to vacate the judgment proved unsuccessful. The Debtor's insurance carrier disclaimed coverage because of an alleged late notice, and the matter is on appeal. In the interim, the Debtor sought Chapter 11 relief to stave off judgment enforcement action by Ms. Malcolm and another creditor.[4]

### III.  ASSIGNMENT OF SIGNATURE BANK CLAIM

14.    The Chapter 11 petition was filed on January 3, 2019 with the intent of preserving the Debtor's going concern value, while the Debtor appealed the decision denying the Debtor's motion to vacate the default. In bankruptcy, the Debtor anticipated that it would refinance the Signature Bank mortgage debt, and generate additional funds to settle the claim with Ms. Malcolm and other creditors.

15.    Perhaps fearful of getting caught up in a protracted bankruptcy, Signature Bank sold its position through an assignment of the Mortgage to the Note Buyer shortly after the Chapter 11 filing on January 15, 2019. Unfortunately, the Note Buyer has quite a different agenda than Signature Bank, and has set dead aim on attempting to reap a huge profit by invoking default interest charges against the Debtor.

---

[4] In addition to the Malcolm claim, the Debtor was involved in a second action concerning a failed settlement agreement with Orlaine Edwards ("Edwards"), which resulted in a judgment against the Debtor in the amount of $50,000. Edwards was likewise pursuing enforcement proceedings.

16.    It was not until May 22, 2019, almost five months after the Chapter 11 filing, that the Note Buyer first raised the spectre of default interest when it issued a payoff letter in response to the Debtor's request, a copy of which is annexed hereto as <u>Exhibit</u> "C".

17.    As the Court can see, this payoff letter references alleged total default interest charges in the sum of $4,866,666, based upon a 24% default rate, without indicating the actual basis for the imposition of default interest.  Instead, the Debtor is left to guess as to how its mortgage ballooned to more than $7 million.

18.    It was not until the Note Buyer filed a creditor's plan (ECF #40) and disclosure statement (ECF #41) on July 8, 2019 that the Note Buyer for the first time stated that the Debtor was allegedly in default by reason of (a) an alleged misrepresentation that Mr. Lowy was the only member of the Debtor when the loan was made in 2014, and (b) the Debtor's failure to remove or bond the judgments obtained by Malcom and Edwards.

19.    These are trumped-up defaults to say the least, raised only after commencement of the Chapter 11 case (in violation of the automatic stay), in an obvious attempt to reap a windfall at the Debtor's expense.  The retroactive demand for default interest becomes even more alarming when one considers that it is based on a rate of 24%, as opposed to the non-default rate of 3.5%.  This gross disparity of 680% exceeds any reasonable estimation of the Note Buyer's damages and renders the rate a penal liquidated damages-type provision.

## IV  ARGUMENT

### A.  Procedural Standards

20.    The standard of review regarding a proof of claim was explained by the Hon. Dorothy Eisenberg as:

> 11 U.S.C. § 502(a) provides that a "claim ... proof of which is [properly filed] ... is deemed allowed, unless a party in interest ... objects." . . . Further, "[a] proof of

claim executed and filed in accordance with [the Federal Rules of Bankruptcy Procedure] shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr.Pro. 3001(f). This puts the burden on the objecting party to come forward with sufficient evidence to refute the claim. Once the objector does so, it is the creditor who bears the "ultimate burden of persuasion as to the validity and amount of the claim." *Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140, 145 (10th Cir. B.AP.2003).

*In re Sheba Realty Corp.*, 2014 WL 1373094, at *6 (Bankr. E.D.N.Y. Mar. 27, 2014). *See, also, In re Residential Capital*, 2014 WL 7331059, *9 (Bankr. S.D.N.Y 2014) ["By producing 'evidence equal in force to the prima facie case, an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to claimant to 'prove by a preponderance of the evidence that under applicable law the claims should be allowed.'"].

### (B) Signature Bank Never Previously Declared a Default

21.      Under Section 8 of the Note, there is no entitlement to default interest absent (i) an Event of Default under the Mortgage or any default by the Debtor under any of the documents securing payment of the principal amount; (ii) if the principal indebtedness is declared immediately due; or (iii) if the principal amount then remaining is not paid in full on the Maturity Date or Extended Maturity Date.  A copy of the Note is annexed hereto as Exhibit "D".

22.      In most instances, an Event of Default as defined under the Mortgage (a copy of which is annexed hereto as Exhibit "E") requires prior notice to the Debtor, as borrower, with an opportunity to cure, save primarily for a payment default (¶2.01(a)) or a materially false "warranty, representation or certification" (¶2.01(b)), pursuant to which there is no express notice requirement.  However, even without an express notice requirement, the Court in *In re Campbell*, 513 B.R. 846, 852 (Bankr. S.D.N.Y. 2014), *aff'd,* 539 B.R. 66 (S.D.N.Y. 2015) analyzing New York law, found no immediate entitlement to default interest absent notice, explaining:

> this type of a general paragraph has been interpreted by the New York cases as 'not self-operative,' intended to simply give the creditor "'the right to treat the entire debt as matured.'" *U.S. Bank Trust Nat'l Corp. v. AMR Corp. (In re AMR Corp.),* 730 F.3d 88, 100 (2d Cir.2013), *citing, Wurzler v. Clifford,* 36 N.Y.S.2d 516, 517 (N.Y.Sup.Ct.1942)".

Accordingly, the Note Buyer's ability to charge default interest does not arise automatically and requires prior notice to the Debtor.

23.    Moreover, while the entry of a judgment against the Debtor is potentially a default under the Mortgage (¶2.01(n)), the Mortgage requires a prior thirty (30) day notice with opportunity to cure before an Event of Default can be declared under Section 2.01[I], which provides in relevant part:

> After any Event of Default, interest shall accrue at the rate of twenty-four (24%) percent per annum (the "Default Rate). Notwithstanding the foregoing, except for an Event of Default under Section 2.01(a), (b), (c), (d), (j) or (k) above, Mortgagee will provide Mortgagor with notice of any Event of Default hereunder and provide thirty (30) days to cure same before accelerating the due date of the Debt and/or charging interest at the Default Rate.

24.    Here, however, no such notice was ever given, and, thus no Event of Default arose. Therefore, the Note Buyer is not entitled to assert a claim for default interest. Indeed, any effort to declare a default retroactively violates the automatic stay, and in particular 11 U.S.C. §362(a)(6), which ". . . operates as a stay . . . [of] any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title".

### (C) There Were No Misrepresentations Made at Closing

25.    Likewise, the Note Buyer cannot validly assert a default based upon events which transpired in 2014 relating to the closing. Suddenly, close to five years after the closing, the Note Buyer now cries foul because Mendy Lowy signed the loan documents as the sole member and manager of the Debtor, although at various times he had a partner by the name of Isaac Schwartz. It appears, however, that the Debtor's operating agreement was superceded in

connection with the loan with Signature Bank and Mr. Lowy was designated as the sole member/manager for purposes of the closing. This is consistent with the fact that the Mr. Lowy is the sole guarantor of the loan.

26.    After the loan was made, Mr. Schwartz returned to being a partner and signed the Chapter 11 petition in that capacity. In any event, however, whether Mr. Lowy was the sole member or had a partner (before or after the closing) is not a material aspect of the transaction. Accordingly, whether the Debtor had one member or two in 2014 does not constitute a material representation permitting imposition of default interest under Section 8 of the Mortgage. Nor did Signature Bank or the Note Buyer suffer any identifiable damages so as to warrant default interest for any alleged misstatement. *See, In re Northwest Airlines Corp.*, No. 05-19730, 2007 WL 3376895 (Bankr. S.D.N.Y. Nov. 9, 2009), where the Hon. Allan L. Gropper specifically denied default interest based upon a concealed breach of a loan agreement because no prior notice was given and the lender could not identify any actual harm or injury, explaining:

> UBS asserts that it should be permitted default interest on the entire accelerated amount of the debt even though it did not declare a default, because the Debtors allegedly concealed a breach of the applicable loan documents which put it in default prior to the filing of their chapter 11 cases.

> On this record, UBS has not supported the proposition that the Debtors incurred liability when they replaced one engine with a similar engine or that any failure to disclose would justify the imposition of default interest . . .

> Although UBS quibbles that the Debtors did not act quickly enough and asserts that it would be inequitable to deny it default interest on all of the debt, UBS identifies no harm or damage from the engine substitution, other than legal fees.

Id., at *5.

27.    Under other federal cases, the lack of a prior notice of default has been held to preclude imposition of default interest. *See, Connecticut Nat. Bank v. Reliance Ins. Co.*, No. 87 CIV. 3216 (1989 WL 88693, at *3 (S.D.N.Y. Aug. 2, 1989)["CNB's position is unreasonable . . .

because it would require the 18% default interest rate to attach before Reliance was given notice of the Principal's failure to tender payment . . . The Court finds that this could not have reasonably need the intention of the parties at the time they entered into the Bond Agreement."]; *Rosenbaum v. DataCom Sys., Inc.*, No. 13 CIV. 5484 , 2014 WL 572529, at *8 (S.D.N.Y. Feb. 13, 2014) ["Absent any express language providing for a retroactive rate increase, the Court declines to imply such a provision into the contract.  The most natural reading of the contract is that the post-default rate commences only upon due notice to the defaulting party."].

28.     Moreover, the New York state courts have long recognized that principles of waiver and estoppel apply in a loan context to preclude enforcement of a default based on equitable grounds arising from a lender's failure to act. *Rockaway Park Series Corp. v. Hollis Auto. Corp.*, 206 Misc. 955, 957 (S.Ct. N.Y.Co.1954), *aff'd*, 285 A.D. 1140 (Sup. Ct. 1955) ["All of the circumstances presented here ... when viewed in their cumulative effect, indicate that the strict enforcement of the acceleration covenant would approach in hardship oppression similar to a penalty."];  *Caspert v. Anderson Apartments*, 196 Misc. 555, 555 (S.Ct. N.Y.Co. 1949) [where plaintiff failed to show it acted without undue delay, its actions were so oppressive and unconscionable as to warrant denial of relief on equitable grounds].  *See, also, Nassau Trust Company v. Montrose Concrete Products Corp.,* 56 N.Y.2d 175 (1982) ["The uncontroverted facts of record establish that the bank has waived its right to foreclosure . . . [and] that to permit resort to the equitable remedy of foreclosure would be unconscionable in the present case."]; *Rose v. Spa Realty Associates*, 42 N.Y. 2d 338 (1977) [waiver may be invoked by words or conduct, including partial performance]; *Arnot v. Union Salt Company,* 186 N.Y. 501 (1906) ["Where a party entitled to enforce payment under a contract has consented to postpone the time of such payment, and the other party has acted upon such consent and in reliance thereon has

permitted the contract time to pass without payment, the creditor may not treat the failure to pay within the time originally specified as a breach of the contract."].

### (D) The Default Interest Rate at 24% Constitutes a Penalty in this Case

29.    Even if waiver and estoppel do not preclude the imposition of default interest, the enforceability of default interest can be considered a penalty under certain circumstances, depending on proportionality.  Runaway default interest that is significantly higher than the non-default rate without a corresponding relationship to a lender's actual damages can be considered a penalty under State law.  *See, Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977) ["A liquidated damage provision has its basis in the principle of just compensation for loss. A clause which provides for an amount plainly disproportionate to real damage is not intended to provide fair compensation but to secure performance by the compulsion of the very disproportion."].

30.    In bankruptcy, there is a presumption that a secured creditor is entitled to be paid interest at the rates set forth in the loan documents.  But this presumption is rebuttable and remains subject to adjustment based upon equitable considerations, including that the stated default rate constitutes a penalty because it is not a reasonable reflection of the lender's potential or actual losses.  *In re Vest Associates*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998) ["[t]he presumption [of validity] may be rebutted if the rate is significantly higher without any justification offered for the spread or where the default rate appears inordinately high in relation to the non-default rate."].  *See also*, *In re Bownetree, LLC*. 2009 WL 2226107 (Bankr. E.D.N.Y. 2009); *In re Liberty Warehouse Assoc. L.P.*, 220 B.R. 546, 552 (Bankr. S.D.N.Y. 1998); *In re General Growth Props., Inc.*, 451 B.R. 323, 326 (Bankr. S.D.N.Y. 2011) ["there is a rebuttable presumption in favor of granting an oversecured creditor interest at the [default] rate specified in

the contract, subject to equitable considerations"]; *In re Milham*, 141 F.3d 420, 423 (2d Cir. 1998) ["Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread this practice may be, it does not reflect an entitlement to interest at the contractual rate"].

31.     Here, the Note Buyer asserts that it is entitled to default interest, without analysis, and without showing why the default interest rate should not be deemed disproportionate on its face, especially given the disparity between the non-default rate of 3.5% and the default rate of 24%. This 21.5 point spread (or 680% increase), taken alone, plainly suggests that the default rate is penal in nature. The Court in *Bowntree* disallowed a default rate of 25%, as compared to a pre-default rate of 12%, finding that the default rate "inequitable" and the difference between the two rates "significant" and "unexplained":

> the majority of courts require a factual and equitable analysis prior to the application of a contractual default rate of interest. *See In re Johnson*, 184 B.R. at 572. In particular, courts have considered the following factors when deciding whether to enforce a contractual default rate as opposed to a non-default rate:
> (1) The difference between the default and non-default rates; (2) the reasonableness of the differential between the rates; (3) the relative distribution rights of other creditors and whether enforcement of the higher rate will do injustice to the concept of equitable distribution of the estate's assets; and (4) the purpose of the higher interest rate. *Id.* at 573.

*In re Bownetree, LLC*, 2009 WL 2226107 at 4.

32.     There is a host of other bankruptcy cases that have disallowed default interest based upon a similarly wide disparities. *See, In re Liberty Warehouse Assoc. L.P., supra*, 220 B.R. at 552 [noting that "[a]bsent contrary evidence, a default interest that is inordinately high relative to the non-default rate will be found to be a penalty"]; *In re Kalian*, 178 B.R. 308, 309

(Bankr. D.R.I. 1995) [18% spread rejected]; *In re The Boardwalk Partners*, 171 B.R. 87, 92

(Bankr. D.Az. 1994) [14.5% differential disallowed]; *In re Hollstrom*, 133 B.R. 535, 537 n. 3–4

(Bankr. D.Col. 1991) [24% spread unreasonable]; *In re DWS Investments*, 121 B.R. 845, 849

(Bankr. C.D.Calif. 1990) [10–11% differential not permitted]; *In re White*, 88 B.R. 498, 499

(Bankr. D.Mass. 1988) [35% spread not allowed].

33.    Here, the default rate goes well beyond any reasonable measure of anticipated damages arising out of the fact that the Debtor's equity structure included two partners instead of one at various points in time.  In the overall scheme of things, this is a minor point, and did not impact the underwriting of the mortgage or the Debtor's performance in making payments.

34.    In sum, given the failure of Signature Bank to ever declare a default, coupled with the history of timely payments of monthly principal and interest,  and the great disparity between the non-default rate and the default rate, the Court cannot easily allow the imposition of default interest, much less at a rate of 24%.  Accordingly, the Claim of the Note Buyer should be reduced to eliminate entitlement to default interest as being unwarranted and penal in nature.

## V.  CONCLUSION

35.    For all of the reasons set forth herein, the Claim should be reduced by the amount sought for default interest.

Dated: New York, NY
        September 9, 2019

Goldberg Weprin Finkel Goldstein LLP
*Attorneys for the Debtor*
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700


By: /s/ Kevin J. Nash, Esq.